# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RICHARD JENKS, JR.<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO VACATE AND SET ASIDE CONVICTIONS AND SENTENCE**<br><br><br>Case No. 2:19-cv-00094-CW<br><br>Judge Clark Waddoups |

Before the court is Defendant Richard Jenks, Jr.'s motion to vacate and set aside his conviction and sentence pursuant to 28 U.S.C. § 2255. (ECF No. 1.) The court previously issued a decision denying Mr. Jenks's petition in full on January 22, 2020. (ECF No. 19.) Mr. Jenks appealed that decision, however, and the Tenth Circuit vacated the court's January 2020 decision in part and remanded the case for an evidentiary hearing regarding Mr. Jenks's claim that his counsel in his criminal matter provided constitutionally ineffective assistance during plea negotiations. *See United States v. Jenks*, Case No. 20-4023, 2022 WL 1252366 at *8-9 (10th Cir. Apr. 28, 2022) (unpublished).

In accordance with the Tenth Circuit's mandate, the court held an evidentiary hearing on April 5, 2023. (*See* Minute Entry, ECF No. 40.) Following the evidentiary hearing, the court

received additional briefing from the parties (*see* ECF Nos. 45, 46, & 49) and heard oral argument on Mr. Jenks's remaining claim on July 19, 2023 (Minute Entry, ECF No. 50).

After considering the evidence presented by the parties, and the parties' briefing and oral argument, the court has concluded that Mr. Jenks has failed to meet his burden of demonstrating that his attorneys provided ineffective assistance of counsel in plea negotiations. Accordingly, the court DENIES Mr. Jenks's petition for the reasons stated herein.

<u>Background</u>

In October 2014, Richard Jenks's stepdaughter, D.W., who was sixteen years old at the time, told her mother that Mr. Jenks had been sexually abusing her since she was ten years old. (Trial Tr. at 310-311, 445-47, Crim. ECF[1] No. 157.) Later that day, D.W.'s mother reported the abuse to the Bureau of Indian Affairs ("BIA"). (*Id.* at 311-313, 447; PSR at ¶ 5, Crim. ECF No. 125.)

After receiving the report, BIA officers immediately interviewed D.W., who told them that Mr. Jenks had been having sex with her for the past five years. (PSR at ¶ 6, Crim. ECF No. 125.) D.W. explained that Mr. Jenks would always use a condom and that they would use baby wipes to clean up after having sex. (*Id.*) The condoms and the baby wipes would then be placed in a sack and disposed of in a large woodpile behind their house. (*Id.*)

On the same day, D.W. took BIA officers to the woodpile where Mr. Jenks would dispose of evidence, where investigators discovered used condoms, napkins, wet wipes, condom wrappers, and other evidence. (PSR at ¶ 9; Trial Tr. at 313-14, 448.) A few days later, an additional search

---

[1]     Citations to materials presented to the court in Mr. Jenks's criminal proceedings appear in the docket for case number 2:15-cr-00072, which will be referenced in this memorandum decision with the notation "Crim. ECF."

of the woodpile was conducted, where additional evidence, including several used condoms, were recovered. (Trial Tr. at 550-57; PSR at ¶ 14.) The evidence was then sent to an FBI laboratory for forensic examination. (Trial Tr. at 623-624.)

The FBI did DNA testing on four of the condoms retrieved from the wood pile. (*Id*. at 626.) The FBI's DNA testing showed that, to a reasonable degree of scientific certainty, Mr. Jenks's DNA was a match with DNA found on one side of one condom and that D.W.'s DNA was a match with DNA found on the other side of the same condom. (*See id*. at 671-73; FBI Lab Report, ECF No. 41 (Ex. 1).) The testing also showed that Mr. Jenks could not be excluded as a minor contributor to DNA found on two other condoms that D.W.'s DNA was found on. (*See id*. at 653-74; FBI Lab Report, ECF No. 41 (Ex. 1).) Mr. Jenks's DNA was not found on one of the condoms tested. (*Id*.)

On February 11, 2015, Mr. Jenks was indicted by a federal grand jury on two counts of aggravated sexual abuse of a child and two counts of sexual abuse of a minor. (Crim. ECF No. 1.) Mr. Jenks was arrested on February 17, 2015 and arraigned two days later, where he was informed of the charges against him and the potential penalties associated with those charges. (ECF Nos. 3 & 12.)

Mr. Jenks was represented in his criminal proceedings by Mr. Rudy Bautista and Ms. Abigail Dizon-Maughan. (Crim. ECF Nos. 3 & 17.)

At some point during pre-trial proceedings, Mr. Drew Yeates, an Assistant United States Attorney representing the United States in the matter, approached Mr. Jenks's counsel about a potential plea deal. Mr. Yeates testified that he discussed with Mr. Jenks's counsel the possibility of a 10-year and 8-year plea deal. (Tr. at 100:10-102:7; 106:10-107:23, ECF No. 43.) Mr. Jenks

claims that there was also discussion of a potential 15-year plea deal, but Mr. Yeates denies that a 15-year plea deal was ever discussed. (*Id*. at 106:3-9.) Discussions about a plea deal, however, never went beyond the government's initial inquiries because Mr. Jenks insisted that he wanted to proceed to trial. (*Id*. at 59:1-19; 84:23-25; 86:16-24; 88:9-89:18; 94:2-11; 119:16-21.)[2]

Prior to trial, Mr. Jenks's counsel retained their own expert to evaluate the FBI's DNA analysis of the condoms mentioned above. Mr. Jenks's DNA expert confirmed the accuracy of the FBI's analysis but noted that there were some weaknesses in matching Mr. Jenks's DNA to DNA found on some of the condoms that were tested. (*See* MBA DNA Consulting Report, ECF No. 41 (Ex. 5).) The report also acknowledged, however, that "some DNA associations were very strong and merited the verbiage of 'to a reasonable degree of scientific certainty.'" (*Id*.)

According to Mr. Jenks, his counsel told him that the government's evidence was very weak and that they should proceed to trial. (Tr. at 9:24-11:5; 11:11-12:23; 14:1-9; 17:3-6.) Mr. Bautista agrees that he viewed the government's DNA evidence as weak based on low statistical evidence of a match on some of the condoms, the possibility of transference, the absence of semen, and his view that there was a motive for fabrication.[3] (*Id*. at 74:6-20; 83:4-17; 84:1-9.) Mr. Bautista testified, however, that while he informed Mr. Jenks of his view of the evidence, he would have never told Mr. Jenks that the evidence against him was "weak." (*Id*. at 83:23-25.)

---

[2]    While Mr. Jenks testified at the evidentiary hearing in this matter that he would have accepted any of the potential plea agreements if he had been adequately informed of the strength of the government's DNA evidence, he admitted that he never told his attorneys that he was interested in pursuing a plea deal, even after hearing all the evidence at trial, and that he told his lawyers that he was innocent throughout the case. (Tr. at 16:9-14; 16:21-24; 18:1-7; 29:10-30:1, ECF No. 43.)

[3]    Ms. Dizon-Maughan claimed that she did not recall having any discussions with Mr. Jenks about the strength of the government's DNA evidence. (Tr. at 44:14-16, ECF No. 43.)

The case proceeded to trial and Mr. Jenks was convicted of one count of aggravated sexual abuse of a child and two counts of sexual abuse of a minor.[4] (Verdict Form, Crim. ECF No. 111.) Mr. Jenks was later sentenced to 30 years in prison and a lifetime of supervised release. (Judgment, Crim. ECF No. 130.)

Mr. Jenks appealed his sentence and conviction. (Notice of Appeal, Crim. ECF No. 134.) On appeal, the Tenth Circuit affirmed Mr. Jenks's conviction but remanded the case for additional findings regarding a condition of supervised release that is not material to the current motion. *See United States v. Jenks*, 714 F. App'x 894 (10th Cir. 2017).

On February 11, 2019, Mr. Jenks filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, which is the subject of the current action. (ECF No. 1.) Mr. Jenks's motion raised four grounds for relief: (1) that his trial counsel provided ineffective assistance by failing to adequately investigate the physical evidence, (2) that his trial counsel provided ineffective assistance during plea negotiations, (3) that his trial counsel provided ineffective assistance by introducing evidence against Mr. Jenks at trial, and (4) that his trial counsel provided ineffective assistance by advising Mr. Jenks to sign a lengthy stipulation regarding the admission of physical evidence at trial. (*Id.*)

After considering briefing from Mr. Jenks and the government, the court denied Mr. Jenks's motion in full. (ECF No. 19.) With respect to Mr. Jenks's argument that his trial counsel provided ineffective assistance in plea negotiations, the court concluded that Mr. Jenks's motion

---

[4]    One count of aggravated sexual abuse of a minor was dismissed on the government's motion during trial. (Trial Tr. at 726:8-25, ECF No. 165.)

failed because Mr. Jenks failed to present credible evidence that the government did in fact offer him a plea deal. (*Id*. at 13-20.)

Mr. Jenks appealed the court's denial of his motion to vacate, and the Tenth Circuit granted a certificate of appealability limited to "whether the district court erred in not holding an evidentiary hearing on the effectiveness of [Mr. Jenks's] trial counsel when they advised [Mr. Jenks] not to accept any proposed plea bargains." *United States v. Jenks*, Case No. 20-4023, 2022 WL 1252366 at *2 (10th Cir. Apr. 28, 2022) (unpublished).

The Tenth Circuit vacated this court's decision to deny Mr. Jenks's motion to vacate with respect to Mr. Jenks's claim that his trial counsel provided ineffective assistance in plea negotiations and remanded the case for an evidentiary hearing. *Id*. at *5.

<u>Analysis</u>

To succeed on his ineffective assistance of counsel claim, Mr. Jenks must prove (1) that his attorneys' performance fell below an objective standard of reasonableness and (2) that prejudice resulted. *Strickland v. Washington*, 466 U.S. 668 (1984). The court concludes that Mr. Jenks has failed to establish either element of his *Strickland* claim with respect to his assertion that his trial counsel provided ineffective assistance of counsel in plea negotiations and that his motion, therefore, must be denied.

**I.    Attorneys' Performance**

To succeed on his *Strickland* claim, Mr. Jenks must overcome a "strong presumption that [his] counsel's conduct f[ell] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. It is not appropriate to view his counsels' performance through the lens of hindsight or to assume it was ineffective merely because it was unsuccessful. *Id*.

Here, Mr. Jenks claims that his counsel were ineffective because they "did not advise him of the consequences of rejecting . . . plea offers from the government." (Petition at 9, ECF No. 1.) More specifically, Mr. Jenks argues that his counsel was deficient in that they (a) failed to retain a DNA expert before settlement discussions occurred, (b) advised Mr. Jenks that the DNA evidence against him was "weak" and that he should proceed to trial before receiving an opinion from the defense DNA expert, and (c) misunderstood the DNA evidence, even after receiving the defense DNA expert's report.

A. <u>Mr. Jenks has not shown that the timing of his trial counsel's retention of a DNA expert constitutes ineffective assistance.</u>

Mr. Jenks first argues that his trial counsel was ineffective by failing to retain, and presumably obtain analysis from, a defense DNA expert before conversations about a potential plea deal occurred. Mr. Jenks, however, has presented no evidence to show when his trial counsel began consulting with a DNA expert and the information they obtained from the consultation. Nor has he shown that the timing of his counsel's retention of a DNA expert fell below an objective standard of reasonableness.

Mr. Jenks points to the fact that his trial counsel sought trial continuances to retain and consult with a DNA expert after plea discussions occurred, and the fact that a formal written report was not obtained until December 2015, to support his claim that his counsel did not timely investigate the strength of the government's DNA evidence.

But Mr. Jenks himself testified that he had discussions with his counsel about retaining a DNA expert in the spring of 2015, before plea discussions. (Tr. at 8:19-9:3.) And Mr. Bautista testified that he had preliminarily retained and consulted with a DNA expert before Ms. Dizon-Maughan filed an ex parte application for authority to retain an expert at government expense in

August 2015.[5] (Tr. at 75:5-77:1.) The application filed by Ms. Dizon-Maughan names the expert that Mr. Jenks's counsel were seeking funding to retain, which corroborates Mr. Bautista's testimony that at least some discussions with the expert had occurred before the date of the application. (*See* Ex Parte Appl. for Auth. to Retain Expert, ECF No. 41 (Ex. 2).) Mr. Jenks has produced no evidence to contradict Mr. Bautista's testimony that a DNA expert was consulted with prior to August 2015.

Mr. Jenks has also failed to present any evidence that his trial counsel did not review and analyze the government's DNA findings before plea discussions occurred.

While the evidence does show that a final report from the DNA expert retained by Mr. Jenks's trial counsel was not provided until December 2015, Mr. Jenks has not presented sufficient evidence to show that his trial counsel did not investigate the strength of the government's DNA evidence before that time. Nor has he proven that his trial counsel did not have adequate information regarding the DNA evidence earlier in the case.

Moreover, even assuming that Mr. Jenks's counsel had not obtained a full understanding of the government's DNA evidence before the government's final attempt to initiate plea discussions in July 2015, Mr. Jenks has presented no evidence to show that the timing of his trial counsels' investigation fell below an objective standard of reasonableness.

---

[5]     Mr. Bautista also testified that he had "a recollection," but could not be sure, that the expert was initially retained with funds from Mr. Jenks's family before government funding for the expert. (Tr. at 75:24-76:5.) Given Mr. Bautista's uncertainty regarding his memory of whether a DNA expert was retained with private funds before government funding was sought, the court will not rely on such testimony to find that an expert was retained earlier in the case. Mr. Bautista's testimony does lend further support, however, to the court's conclusion that Mr. Jenks has failed to prove that his trial counsel's investigation of the government's DNA evidence through consultation with an expert did not fall below an objective standard of reasonableness.

As discussed in further detail below, the evidence shows that Mr. Jenks quickly shut down any discussions of a potential plea deal, and insisted that he wanted to go to trial, any time he was informed by his trial counsel that the government was willing to discuss a potential plea offer. The evidence also shows that while Mr. Jenks was informed by his counsel of the potential sentence that the government may be willing to agree to as part of a plea deal, discussions never advanced beyond that initial stage. There is no evidence that Mr. Jenks ever asked his counsel about the DNA evidence after being informed of the government's inquiries. Nor is there any evidence that Mr. Jenks's trial counsel provided erroneous information regarding the DNA evidence during discussions of a potential plea.

Mr. Jenks's counsel had an obligation to inform Mr. Jenks of the government's inquiries about a potential plea deal, regardless of what stage they were in with respect to investigating the strength of the government's DNA evidence. Had Mr. Jenks shown an interest in considering a potential plea deal, his trial counsel may have expedited their investigation into the strength of the government's DNA evidence in order to ensure that Mr. Jenks was fully informed of the evidence against him. But as Mr. Jenks showed no interest in considering a potential plea, the court cannot find, on the record before it, that the timing of Mr. Jenks's trial counsel's investigation of the government's DNA evidence was below an objective standard of reasonableness.

B.   <u>Mr. Jenks has not shown that he received ineffective advice regarding the strength of the government's DNA evidence when discussing the potential for a plea agreement</u>.

Mr. Jenks's claim that he received ineffective advice regarding the strength of the government's DNA evidence during plea discussions relies primarily on his own testimony, as well as some testimony from Mr. Bautista and Mr. Yeates.[6]

While Mr. Jenks gave generalized testimony about his counsel advising him that the government's case was weak, he gave very little testimony about any specific discussions he had with his counsel about the DNA evidence. Indeed, the only testimony that Mr. Jenks gave that was specifically about discussions he had with his counsel about the strength of the DNA evidence was the following reference to a conversation he had with Ms. Dizon-Maughan:

> [S]he kind of went over the statistics of the ratios and that, I think it was the DNA, I don't know, and she said that basically this could be any part of your family, could be a brother, your sister, DNA or other tribal members it could be – it could be theirs. So they said we're going to, based on that, we're going to continue.

(*Id*. at 15:15-22.) Mr. Jenks testified that that conversation occurred while discussing the defense DNA expert's report, which he did not obtain until sometime in December 2015, months after the purported settlement offers were discussed.

---

[6]   During the evidentiary hearing, Ms. Dizon-Maughan claimed that she recalled almost nothing from her representation of Mr. Jenks during his criminal trial, including basic facts such as who took the lead at trial or whether she worked on any motions. (*See, e.g.*, Tr. at 35:16-36:8.) The court finds, given the significance of the case and Ms. Dizon-Maughan's relative inexperience representing criminal defendants in federal court at the time, that Ms. Dizon-Maughan's claim that she does not recall basic details regarding her representation of Mr. Jenks lacks credibility. Accordingly, the court will disregard Ms. Dizon-Maughan's testimony when evaluating Mr. Jenks's allegations.

Mr. Jenks's testimony regarding communications with his counsel about the DNA evidence is quite vague and conclusory. He did not testify about any specific conversations about whether his DNA was present on any piece of physical evidence. Nor did he testify that his counsel told him that "the government's DNA test results revealed a low probability that any of the condoms contained his DNA." *See United States v. Jenks*, 2022 WL 1252366 at *7. Instead, he testified only that he was told by his counsel that the government's evidence, in general, was "weak" or "not strong." (*See, e.g.*, Tr. at 11:3-5; 12:14-23; 14:3-9, ECF No. 43.) Accordingly, the court finds that Mr. Jenks's testimony, by itself, does not support his claim that his trial counsel told him that the government's DNA testing demonstrated that there was a low probability that his DNA was present on any of the condoms tested.

Other evidence relied on by Mr. Jenks to corroborate his allegation that his trial counsel misled him regarding the strength of the government's DNA evidence also fails to overcome the "strong presumption that [his] counsel's conduct f[ell] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

For example, Mr. Jenks relies heavily in his briefing on his testimony that, at some point near the beginning of trial, Mr. Bautista turned to him and said, "I may have misrepresented the evidence." (*Id*. at 30:1-5.) Mr. Jenks testified that Mr. Bautista immediately got up and addressed the court after saying that. (*Id*. at 30:4-5.) And he testified that he (Mr. Jenks) said, "[T]hat's a fine time to tell me. If I had known about the evidence, I would have probably made some kind of plea deal." (*Id*. at 30:5-7.) Mr. Jenks did not testify specifically, however, about what evidence his counsel purportedly misrepresented or what the purported misrepresentation was.

In his briefing, Mr. Jenks attempts to link his testimony regarding this supposed event to Mr. Bautista's testimony that Mr. Jenks's DNA expert did not testify as expected. (*See* Pet'r's Post Hr'g Br. at 9, 16, ECF No. 45.) But Mr. Jenks claimed that Mr. Bautista's alleged admission that he "misrepresented" the evidence occurred "when introductions were made at the beginning of the trial," (Tr. at 30:1-4), while Mr. Jenks's DNA expert did not testify until the last day of trial, immediately before the defense rested (Trial Tr. 785-815, Crim. ECF No. 165). Therefore, Mr. Jenks's claim that Mr. Bautista admitted to "misrepresenting" the evidence could not have been in relation to testimony that did not occur until several days later.

Moreover, Mr. Jenks admitted in his testimony that he never told his trial counsel that he was interested in pursuing a plea deal after learning of Mr. Bautista's supposed misrepresentation or after hearing the government's evidence at trial. (Tr. at 29:10-30:1.)

The court finds that Mr. Jenks's vague and conclusory claim that his trial counsel admitted to him that he had "misrepresented" the DNA evidence is not corroborated and lacks credibility. It does not support a finding that Mr. Jenks's counsel misled him about the likelihood that his DNA was found on any of the condoms at issue.

Mr. Jenks also points to Mr. Bautista's testimony that he believed the government's DNA evidence to be weak and that it could be rebutted at trial. Mr. Jenks testified that his trial counsel told him that the government's evidence, in general, was not strong or conclusive. (Tr. at 10:5-11:5; 12:8-23; 14:1-7; 17:1-6.) Mr. Bautista testified that he did believe the DNA evidence was "weak" because:

> the statistical analysis was -- I'm used to seeing DNA where it is one in quadrillion and these were 1 in 1,200. For some reason, I remember 1 in 1,200. And not only that, but that was on the outside of the condom and that could have been from transference from the

> trash, it was in a trash pile, so that DNA could have been a host of
> people and if it were him it could have been there from transference.
> And it was odd that DNA would be on the outside of the condom
> and not on the inside.

(Tr. at 74:10-20.) Mr. Bautista further testified, however, that he would never have told Mr. Jenks

that the DNA evidence was "weak." (Tr. at 83:23-25.) Instead, he summarized the advice he gave

to Mr. Jenks as follows:

> I would never have used [the term "weak"], but that the case was
> premised on the allegations of his stepdaughter, where there were
> inconsistencies and motive for fabrication, and that the physical
> evidence was explainable. And since his -- since they didn't have --
> more correctly none of the -- they were in the trash pile, didn't have
> semen, it could have been a host of family member DNA not just
> him, and none of it was consistent with sex, that the forensic
> evidence did not shut the door as to guilt.

(Tr. at 83:25-84:9.)

Mr. Bautista's summary is consistent with the approach Mr. Jenks's counsel took at trial.

While that defense ultimately proved to be unsuccessful, the court cannot rely solely on hindsight

and the negative result at trial to conclude that Mr. Jenks's counsel gave ineffective advice during

plea discussions. *See Strickland v. Washington*, 466 U.S. at 689 ("A fair assessment of attorney

performance requires that every effort be made to eliminate the distorting effects of hindsight, to

reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time."). To avoid relying too heavily on hindsight, the court "must

indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance; that is, the defendant must overcome the presumption that, under the

circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citation

omitted).

Here, Mr. Jenks has not presented evidence beyond the ultimate result at trial to show that Mr. Bautista's assessment of the government's case, and the advice he gave to Mr. Jenks, was below an objective standard of reasonableness.

On appeal, the Tenth Circuit explained that if Mr. Jenks could prove that "his trial counsel told him that the government's DNA test results revealed a low probability that any of the condoms contained his DNA," he could sustain his claim for ineffective assistance of counsel. *Jenks*, 2022 WL 1252366 at *3. This court agrees. Mr. Jenks, however, has not met his burden of proving that his trial counsel ever made such a representation to him.

While there is evidence that Mr. Jenks was told that some of the government's DNA testing showed a low probability that his DNA was present on *some* of the condoms, there is no evidence that Mr. Jenks was told by his counsel that there was a low probability that *any* of the condoms contained his DNA. Indeed, Mr. Bautista testified that he believed where Mr. Jenks's DNA was found by the government's testing, it could be explained by transference, a theory that assumes that Mr. Jenks's DNA was present. (Tr. at 74:14-18.)

Mr. Jenks has not shown that it was objectively unreasonable for Mr. Bautista to conclude that the evidence showed a low probability of Mr. Jenks's DNA being present on *some* of the condoms. Indeed, Mr. Yeates, the government's attorney in Mr. Jenks's criminal prosecution, testified that part of the motivation for attempting to initiate settlement discussions was his own assessment that there were some weaknesses in the DNA evidence. (Tr. at 10:10-18.)

Mr. Yeates also testified that Mr. Bautista discussed with him, before trial, how he intended to explain the presence of Mr. Jenks's DNA where the government's DNA evidence was more

14

conclusive, lending further support for a conclusion that Mr. Bautista understood that there was evidence that Mr. Jenks's DNA was present on some of the physical evidence. (Tr. at 116:18-25.)

In order to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Mr. Jenks has the burden to prove that he was misinformed by his trial counsel about the likelihood of his DNA being present on *any* of the condoms tested by the government. He has not met that burden. Accordingly, the court cannot find that advice from Jenks's counsel regarding the strength of the government's DNA evidence failed to meet an objective standard of reasonableness.

C.   <u>Mr. Jenks has not shown that his counsel misunderstood the government's DNA evidence</u>.

Finally, to support his assertion that he received ineffective advice regarding the strength of the government's DNA evidence, Mr. Jenks claims that the evidence shows that his trial counsel misunderstood the government's DNA evidence prior to trial. Mr. Jenks points to a statement by Mr. Bautista, in a pretrial conference, suggesting that there was no evidence that showed that Mr. Jenks's DNA was definitively present on any of the condoms. (Pet'r's Post-Hr'g Br. at 15, ECF No. 45.)

At the final pretrial conference held in December 2015, Mr. Bautista told the court:

> They have found DNA evidence. However, unfortunately, it is very -- the level of it is very weak in our opinion. For example, they claim that the -- that they found some DNA evidence that the defendant cannot be excluded from, but as a minor contributor, but no DNA evidence that says -- that identifies him specifically, nor any DNA evidence that has him as a major contributor. And so with a minor contributor and cannot be excluded.

(Tr. of Final Pretrial Conf. at 7:23-8:5, Crim. ECF No. 155.)

When viewed alone, this statement may suggest that Mr. Bautista believed, shortly before trial, that Mr. Jenks's was not found to be a major contributor of DNA on any of the condoms tested by the government, an assessment that would have been erroneous. When all of Mr. Bautista's statements to the court at the final pretrial conference are viewed together, however, it is less clear what Mr. Bautista understood about the government's DNA evidence.

Later in the hearing, Mr. Bautista had the following colloquy with the court:

> MR. BAUTISTA: Unfortunately, Your Honor, I would ask for clarification on the evidence that I propose because I believe that the evidence is overwhelmingly in favor of the defense that I would like to introduce it in opening statement.
>
> THE COURT: That is that –
>
> MR. BAUTISTA: That the evidence they recovered, towelettes and condoms purported to be used by the defendant had –
>
> THE COURT: All it takes is one condom from that pile to meet a specific instance. The fact that there may have been a pile of condoms and hair samples and other debris that suggests that the defendant was intimate with other people doesn't exclude the circumstances in this case.
>
> MR. BAUTISTA: But the defendant is excluded from all of them. So therefore it is not his. We don't find his pubic hair, we find another individual's hair. So he is excluded from them so –
>
> THE COURT: But that doesn't overcome the fact that there is – there are three or four condoms, three of which he is possibly included and one that is a specific match. Showing that there were other condoms and other pubic hairs and other hair samples that were not matches doesn't exclude those four.
>
> MR. BAUTISTA: In the one condom it's alleged to be – again, none of it is truly identifying him, but it's on the outside of the condom and that could be established by transference with other trash. His DNA is not found on the inside of the condoms.

16

(*Id*. at 26:7-27:10.) This exchange suggests that Mr. Bautista did understand that there was evidence of Mr. Jenks's DNA found on one side of one of the condoms.

After reviewing all of the statements made by Mr. Bautista at the final pretrial conference, the court cannot conclude that the statements satisfy Mr. Jenks's burden to overcome the strong presumption that Mr. Bautista's representation was objectively reasonable. The statements do not suggest anything about what Mr. Jenks's trial counsel represented to him in private consultations.

Accordingly, Mr. Jenks has failed to meet his burden of proving the first element of the *Strickland* test—that his counsels' representation fell below an objective standard of reasonableness.

## II.    Prejudice

Even if the court were to accept that Mr. Jenks's counsel gave him constitutionally deficient advice about the strength of the government's DNA evidence during discussions of a potential plea, Mr. Jenks's motion would still be denied because Mr. Jenks has failed to show that he was prejudiced by any such advice.

To show prejudice in the context of plea negotiations, Jenks must show that "the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012). More specifically, Jenks needs to show that (a) "but for his counsel's deficient performance, he and the government were reasonably likely to enter a plea agreement;" (b) "the court was reasonably likely to have accepted the plea agreement;" and (c) "the conviction, sentence, or both with the plea agreement would have been less severe than the judgment imposed without it." *See Jenks*, 2022 WL 1252366 at *3.

For purposes of its analysis, the court will assume that Mr. Jenks's conviction and sentence would have been less severe had he entered a plea agreement than the conviction and sentence he received as a result of going to trial. Even with such an assumption, however, Mr. Jenks's fails to show prejudice because (1) he has not shown that the government ever offered him a plea deal, (2) he has not shown a reasonable likelihood that he would have accepted a plea deal, even if he had received all of the advice he now claims he was owed, and (3) he has not shown that the court would have accepted the plea agreement that he claims he would have agreed to.

A.    Mr. Jenks has not shown that he received a plea offer from the government.

In *Lafler v. Cooper*, the Supreme Court recognized that criminal defendants have a constitutional right, where "a plea bargain has been offered, . . . to effective assistance of counsel in considering whether to accept it." 566 U.S. at 168. "If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." *Id.*

While the right to effective assistance of counsel in considering whether to accept a plea offer from the government is well-established, the Court in *Lafler* emphasized that the right at issue did not include a "right to be offered a plea . . . []or a federal right that the judge accept it." *Id.* (quoting *Missouri v. Frye*, 566 U.S. 134, 148-49 (2012)). Thus, where "no plea offer is made, or a plea deal is accepted by the defendant but rejected by the judge, the issue raised [in *Lafler*] simply does not arise." *Id.*

Many courts applying *Lafler*, including the Tenth Circuit, have held that proof that the government made an actual plea offer is a prerequisite to showing prejudice with respect to an ineffective assistance claim raised in the context of a rejected plea agreement. *See, e.g.*, *Ramirez*

*v. United States*, 751 F.3d 604 (8th Cir. 2014) (holding that the absence of a formal plea offer from the government precluded a claim for ineffective assistance of counsel); *United States v. Kalu*, 683 F. App'x 667, 669 (10th Cir. March 28, 2017) (unpublished) (denying certificate of appealability where discussions of the possibility of a 30-37 month sentence did not constitute a formal plea offer); *United States v. Rendon-Martinez*, 497 F. App'x 848 (10th Cir. Sept. 27, 2012) (unpublished) (denying certificate of appealability on ineffective assistance of counsel claim where "there was no plea offer made"). *See also Byrd v. Skipper*, 940 F.3d 248, 264 (6th Cir. 2019) (Griffin, J., dissenting) (citing cases requiring proof of a plea offer).

Mr. Jenks argues that, despite the Supreme Court's decision in *Lafler*, and the holdings of the cases cited in the previously paragraph, he should not be required to prove that a formal plea offer was extended to him by the government. In doing so, he relies primarily on the Sixth Circuit's holding in *Byrd v. Skipper*. In *Byrd*, the Sixth Circuit held that a defendant could succeed on an ineffective assistance of counsel claim by "establishing a reasonable probability that but for counsel's errors, the petitioner would have received a plea offer." 940 F.3d at 257. *Cf. United States v. Pender*, 514 F. App'x 359, 361 (4th Cir. March 20, 2013) (unpublished) (remanding case for evidentiary hearing regarding whether trial counsel's failure to initiate plea negotiations constituted ineffective assistance).

The court is not persuaded by the reasoning of the Sixth Circuit. That court's conclusion that ineffective assistance of counsel can be established by showing a reasonable probability that a plea offer would materialize upon further negotiations appears to be inconsistent with the reasoning of the Supreme Court in *Lafler* and is contrary to the holdings of the Eighth Circuit in *Ramirez* and the Tenth Circuit in *Kalu* and *Rendon-Martinez*. While the Tenth Circuit's decisions

in *Kalu* and *Rendon-Martinez* are not binding precedent in this case, the court finds their reasoning to be proper and in line with the holding in *Lafler*. Accordingly, the court concludes that to succeed on his ineffective assistance of counsel claim, Mr. Jenks must prove that the government actually extended him a plea offer that he could have accepted.

Here, Mr. Jenks failed to present any evidence to persuade the court that its original conclusion that no plea offer was made was incorrect. As discussed in the court's initial decision denying Mr. Jenks's motion to vacate, analogizing a plea agreement to a contract is helpful in determining whether a plea offer was made by the government in this case. *See Puckett v. United States*, 556 U.S. 129, 137 (2009) ("Although the analogy may not hold in all respects, plea bargains are essentially contracts."). And "[i]n order for a contractual offer to exist, it must contain sufficiently definite terms to enable a fact finder to interpret and apply them." *Mavashev v. United States*, No. 11-CV-3724 DLI, 2015 WL 1508313, at *10 (E.D.N.Y. Mar. 31, 2015) (unpublished). Thus, the pertinent question here is whether communications between the government and Mr. Jenks's counsel included sufficient information identifying the essential terms of a plea agreement such that those communications rose to the level of a plea offer. The court finds that Mr. Jenks has not met his burden of proving that he was ever extended a plea offer by the government.

Mr. Jenks argues that the evidence proves that the government made "informal"[7] plea offers through its communications with his counsel. The government, on the other hand, contends that there is no evidence that a plea offer, formal or informal, was ever extended to Mr. Jenks.

---

[7]      The court does not find the distinction between an "informal" and a "formal" plea offer to be helpful in this case. Instead, as discussed further below, an offer to enter a plea agreement must be sufficiently definite such that the essential terms of the agreement are known when the offer is accepted. Whether the offer is presented through a formal, written memorandum, or through more informal means of communication, is irrelevant to the determination necessary in this case.

Instead, the government argues, the evidence only shows that an invitation to discuss a potential plea deal was made.

At the evidentiary hearing, Mr. Jenks testified that his trial counsel had informed him that the government had made three plea offers that included proposed sentences of fifteen, ten, and eight years, respectively. (Tr. at 10:5-12; 11:14-24; 13:2-9.) But Mr. Jenks was unable to testify about any of the details of the purported offers beyond the potential length of sentence, including the charges he would be required to plead to, the conduct he would be required to admit, or the authority under which the plea agreement would be entered. (Tr. at 22:18-24:5; 24:19-25:7; 25:24-26:14.)

Mr. Bautista testified that he had "a recollection that the 8-year offer was a formal offer," but acknowledged that discussions about a potential plea deal never advanced to other details because "we never got to an agreement as to the time." (Tr. at 92:23-24; 94:2-18.) He also testified that he understood communications he received from the government's attorneys to be an invitation to discuss a potential settlement and that a plea offer would need to contain certain terms so the offer could be evaluated on its merits. (Tr. at 92:4-7; 93:2-10.)

In addition to his and Mr. Bautista's testimony, Mr. Jenks points to an email from Mr. Yeates to his trial counsel raising the prospect of plea negotiations. The email states, in relevant part:

> Rudy and Abby,
>
> Could you tell me whether you think there in [sic] any chance of this trial going forward on 9/28? It's going to require a lot of time and attention in order for me to be prepared to try it on that date.
>
> Also, I would like to broach the subject of a settlement. If I recall correctly, I previously mentioned to Abby the possibility of a 10

year deal. Having re-evaluated the case, I believe I could probably obtain approval to offer something closer to 8 years. Let's discuss at your leisure.

J. Drew Yeates

(Email from D. Yeates to R. Bautista & A. Dizon Maughan, ECF No. 4 (Ex. 7).)

Mr. Yeates testified that the email quoted above is the only written communication that he was aware of with Mr. Jenks's counsel regarding a potential plea agreement, although he testified that he had previously discussed the prospect of a plea deal with Mr. Jenks's counsel on the telephone. (Tr. at 100:10-101:9.) Mr. Yeates, like Mr. Bautista, testified that discussions of a potential plea agreement never advanced beyond discussions of the potential length of sentence because he was informed by Mr. Jenks's counsel that Mr. Jenks was not interested in a plea. (Tr. at 101:10-102:7; 107:17-108:9; 119:11-21.)

Mr. Yeates also testified that he did not have authority to extend a plea offer to Mr. Jenks at the time the above-referenced email was sent and that there was no guaranty that he would have obtained authority, although he believed he could obtain approval if Mr. Jenks was willing to negotiate. (Tr. at 102:19-104:8; 105:1-106:2; 106:23-107:3; 113:1-10.) To obtain authority, Mr. Yeats testified that he would have had to draft a memorandum describing the justification for the plea offer, any statutory minimum sentence requirements, and the anticipated sentencing guideline range. (Tr. at 104:9-25.) Mr. Yeates did not draft any of the documents needed to obtain approval because he was informed that Mr. Jenks's was not willing to accept a deal. (Tr. at 122:11-124:23.)

Mr. Yeates testified that, because he typically only had "one chance to resolve the case," his practice was to "work hard to get defense counsel's commitment that their client will accept the deal before we seek authority to even offer it because we don't go back and negotiate after

already making an offer." (Tr. at 121:17-122:3.) And he testified that he never sought approval for a plea offer because he never received any indication from Mr. Jenks's counsel that Mr. Jenks was willing to accept a plea deal. (Tr. at 122:4-8.)

With respect to the email, Mr. Bautista also testified that he understood it to be an invitation to discuss settlement and that approval would need to be obtained before an offer could be made. (Tr. at 87:19-88:1; 92:4-7; 92:25-93:5.)

The evidence presented to the court is not sufficient to support Mr. Jenks's claim that a plea offer was extended to him by the government. While there is no dispute that there was some conversations between counsel for the government and Mr. Jenks regarding the length of sentence that might be included in a potential plea agreement, there is no evidence that there was any discussion or proposal that included other essential terms, such as the charges Mr. Jenks would agree to, the specific conduct Mr. Jenks would admit to, or what authority approval of the plea agreement would be sought under. Mr. Jenks could not have entered a plea agreement without further discussion and negotiation of such terms.

Moreover, the evidence shows that Mr. Yeates did not have approval to extend a plea offer to Mr. Jenks. Mr. Yeates did not undertake to seek approval from his supervisors by drafting a plea memorandum or taking other steps necessary to obtain authority to extend an offer. While Mr. Yeates testified that he believed he could obtain approval if Mr. Jenks was interested in pursuing a plea agreement, he also testified that approval was not guaranteed and that he had been denied approval after it was sought on a couple of occasions in the past.

Despite the lack of evidence, Mr. Jenks argues that the circumstances of this case are similar to those at issue in this court's prior decision in *United States v. Polatis*, Case No. 2:10-cr-

0364, 2013 WL 1149842 (D. Utah March 19, 2013) (unpublished). In *Polatis*, this court granted a criminal defendant's "Motion to Compel the United States to Reoffer the Plea Agreement Previously Rejected by the Defendant Due to Ineffective Assistance of Counsel." *Polatis*, 2013 WL 1149842 at *12. In his motion to compel, the defendant alleged specific, non-conclusory facts that the Government had in fact made him a plea offer. (*See* Mem. Supp. Mot to Compel United States to Reoffer Plea Agreement at 3-5, *Polatis*, Case No. 2:10-cr-00364 (D. Utah Sept. 24, 2012), ECF No. 311.) Importantly, the defendant alleged two critical terms of the offer—which counts he would plead guilty to and the range of possible punishment for pleading guilty to those counts. (*See id*. at 4–5 ("On December 8, 2012, Mr. Leigh received another email from the United States amending the offer in the form of an email to require a plea to two murder-for-hire counts instead of one. . . . Mr. Polatis states he was aware the sentencing range for the offer was 151-188 months, and that it would require him to plead to two of the murder-for-hire counts.").)

After receiving the criminal defendant's motion that included specific, non-conclusory allegations of a plea offer, this court held an evidentiary hearing. (*See* Minute Entry, *Polatis*, Case No. 2:10-cr-00364, (D. Utah Dec. 7, 2012), ECF No. 326.) At that evidentiary hearing, the email from the prosecutor's offer was introduced as an exhibit. (*See* Hr'g Exs., *Polatis*, Case No. 2:10-cr-00364 (D. Utah Dec. 7, 2012), ECF No. 327-1.) The plea offer provided, in relevant part:

> At the present time, we are looking to supersede tomorrow. . . . That guideline range is 324–405 months, criminal history category I.
>
> I would be willing to go to the screening committee with an agreement whereby *Mr. Polatis would plead guilty to only one count of murder-for-hire and we would agree that the judge would sentence him somewhere in the 151–188 month range.* (We both could argue for whatever sentence within that range we want the judge to give.) . . .

> While I realize this is a significant sentence which will be difficult for Mr. Polatis to accept, I believe that if he were to go to trial, we would prevail and he could well be facing a life sentence, depending on how the issue of multiple counts is handled. And if he were to plead, he would receive credit for time served in this case and could receive 54 days off his sentence each year for good time.
>
> As I mentioned, if Mr. Polatis is amenable, I would be willing to present this *offer* to our screening committee. I need to let you know that the screening committee will have the final say on the deal—I do not have that authority.

*Polatis*, 2013 WL 1149842 at *1–2 (emphases added). The prosecutor in that case later amended the offer. *See id.* at *3 ("On December 8, 2010, Ms. Travis sent a follow-up email explaining that she had made a mistake in her email the previous day because Defendant would need to plead to two counts of murder-for-hire and not one."). After defense counsel filed a motion to dismiss, the prosecutor in that case sent an email to defense counsel stating that because the defendant's "intentions have been to litigate this case with the United States rather than negotiate . . . the [Government's] *offer* is hereby withdrawn." *Id.* at *3 (emphasis added). The prosecutor also testified that she would not have presented a plea offer to Mr. Polatis unless she was confident she could obtain final approval for the proposed agreement. *Id.* at *11.

Based on the evidence presented, the court found that a plea offer had been made to the defendant in *Polatis* and ordered the government to reoffer the proposed plea agreement it had previously made. *Id.* at *12.

The facts in this case are easily distinguishable from the circumstances presented in *Polatis*. Unlike in *Polatis*, the government's communication with Mr. Jenks's counsel did not propose what charges Mr. Jenks would plead guilty to or indicate a specific sentencing range.

Moreover, in *Polatis*, the prosecutor consistently referred to her proposal as an "offer," whereas in this case Mr. Yeates indicated that he had previously discussed the "possibility of a 10 year deal" and would seek "approval to offer something closer to 8 years." Mr. Yeates's use of prospective language made clear that he was not making a firm plea offer, but instead was willing to discuss obtaining approval to make an offer if Mr. Jenks was interested. Mr. Yeates's email cannot be reasonably construed to include a definite offer to enter a plea agreement.

Finally, the evidence shows that Mr. Yeates did not have authority to offer a plea deal at the time of his communications with Mr. Jenks's counsel. Although the court relied on the prosecutor's testimony in *Polatis* that final approval of the plea offer would likely be obtained, Mr. Yeates's testimony in this case is notably different. Although Mr. Yeates testified that he believed approval for some offer could be obtained, he clearly testified that he did not have authority at the time of his discussions with Mr. Yeates's counsel, that he had not taken any steps to obtain approval to make an offer, and he had experienced circumstances in the past where approval was denied after he sought it. Accordingly, the court has no basis to find that Mr. Yeates had implied approval to enter a plea agreement with Mr. Jenks at the time of the settlement discussions at issue in this case. *See United States v. McCall*, Case No. C 00-00505 WHA, 2014 WL 3362000 at *2 (N.D. Cal. July 7, 2014) (unpublished) (distinguishing *Polatis* on grounds that further discussion was necessary to determine essential terms of plea agreement and final approval of the agreement could not be assumed).

Because Mr. Jenks has failed to meet his burden of proving that the government extended him a plea offer, his claim of ineffective assistance of counsel necessarily fails and his motion must be denied.

26

2.    <u>The evidence shows Mr. Jenks would not have accepted a plea offer</u>.

Even if the government's communications with Mr. Jenks's counsel could be construed as conveying a plea offer, the evidence shows that Mr. Jenks would not have entered a plea agreement with the government even if he had all the information he claims he was not provided by his counsel.

In addition to showing that he received a plea offer, Mr. Jenks also has the burden to prove that he would have accepted a plea deal, had his counsel's performance not been deficient, to establish prejudice under *Strickland*. *See Missouri v. Frye*, 566 U.S. 134, 147 (2012) ("To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel.").

Importantly, to meet his burden, Mr. Jenks must prove with evidence that there is a reasonable probability that he would have accepted a plea agreement and may not rely solely on his own self-serving statements. *United States v. Watson*, 766 F.3d 1219, 1226 (10th Cir. 2014). The court may not upset Mr. Jenks's conviction "solely because of *post hoc* assertions . . . about how he would have pleaded but for his attorney's deficiencies." *Lee v. United States*, 582 U.S. 357, 369 (2017). Instead, the court must "look to contemporaneous evidence to substantiate [Mr. Jenks's] expressed preferences." *Id*.

Here, to meet his burden, Mr. Jenks relies primarily on his own self-serving testimony that he would have accepted a plea offer if he had known that the evidence showed that his DNA matched DNA found on one of the condoms. (*See* Pet'r's Post Hr'g Br. at 9 (citing Tr. at 17, 19-

21), ECF No. 45.) As noted above, Mr. Jenks's *post hoc* assertion that he would have accepted a plea offer from the government cannot, by itself, satisfy Mr. Jenks's burden. Thus, the court must look to contemporaneous evidence to determine whether Mr. Jenks's claim can be substantiated.

Mr. Jenks argues that the substantial disparity in the mandatory minimum sentence he received, compared to the proposed sentences he may have received had he accepted the government's purported plea offers, constitutes contemporaneous evidence to support his current claim that he would have pleaded guilty had he been properly informed about the evidence against him.

In support of this argument, Mr. Jenks cites the D.C. Circuit's decision in *United States v. Knight*, 981 F.3d 1095 (D.C. Cir. 2020). In *Knight*, the defendant was arrested for armed robbery and kidnapping. *Id.* at 1099. The government offered a generous plea offer, proposing that the defendant plead guilty to a single count of assault with a dangerous weapon. *Id.* Under the relevant sentencing guidelines, the proposed plea agreement included a likely sentence of between two and six years in prison. *Id.* The defendant's counsel, however, erroneously advised the defendant that the plea offer required him to serve ten years in prison and failed to advise the defendant of the consequences of rejecting the deal. *Id.* Relying on his counsel's advice, the defendant rejected the deal and was sentenced to more than 22 years in prison after being convicted by a jury. *Id.*

The D.C. Circuit, relying in part on the significant disparity between the sentence the defendant received and the sentence he would have received had he accepted the government's offer, found that it was reasonably likely that the defendant would have accepted the plea deal had he been properly advised by his counsel. *Id.* at 1102-04.

The sentencing disparity, however, was not the only contemporaneous evidence the D.C. Circuit relied on in coming to its conclusion. The court also pointed to contemporaneous evidence showing that the defendant was open to considering a plea deal if the terms were right, including evidence that the defendant inquired about what the government was offering and was willing to consider additional information from his counsel after initially rejecting the erroneous ten-year offer. *Id*. at 1104.

Mr. Jenks also points to *United States v. Kearn*, 578 F. Supp. 3d 1221 (D. Kan. 2022) to support his contention that an extreme sentencing disparity can constitute contemporaneous evidence to substantiate a defendant's *post hoc* claim that they would have accepted a plea deal if properly advised by counsel. But *Kearn*, which relied heavily on *Knight*, also pointed to contemporaneous evidence beyond the sentencing disparity to support its finding that there was a reasonable probability that the defendant would have accepted the plea deal at issue in that case. *Kearn* recognized that the D.C. Circuit in *Knight* had relied on "two key pieces of contemporaneous evidence: (1) the significant disparity in sentencing exposure between the plea offer and going to trial, and (2) evidence from the period when the plea was available to defendant showing that the defendant was amenable to pleading guilty and not otherwise dead-set on going to trial." *Id*. at 1241. Applying the reasoning of *Knight*, the court in *Kearn* found that the defendant's claim that he would have pleaded guilty absent his counsel's erroneous advice was substantiated, not only by the significant sentencing disparity at issue in that case, but also by contemporaneous evidence that the defendant would have been amenable to entering a plea deal if the government could supply the factual basis for the plea. *Id*.

In contrast to *Knight* and *Kearn*, Mr. Jenks has presented no contemporaneous evidence in this case that he was amenable to considering any plea offer from the government prior to his conviction at trial. Indeed, the evidence in the record suggests the opposite—that Mr. Jenks was dead-set on going to trial and communicated that preference to his counsel repeatedly.

Mr. Jenks himself testified that he consistently told his trial counsel that he was innocent of the charges against him and admitted that he never told his attorneys, at any point, that he was interested in pursuing a plea deal, even after he heard the evidence against him at trial. (Tr. at 16:9-14; 16:21-24; 18:1-7; 29:10-30:1.)

Mr. Bautista[8] agreed in his testimony that Mr. Jenks insisted he was innocent. (Tr. at 84:23-25.) And he testified that Mr. Jenks had repeatedly insisted that he would not accept a plea deal and was adamant about wanting to go to trial. (Tr. at 84:23-25; 86:16-24; 88:9-89:18; 94:2-11.)

Mr. Yeates also testified that he was informed by Mr. Jenks's counsel that Mr. Jenks would not consider any plea deal. (Tr. at 119:16-21.)

*Knight* and *Kearn* are also distinguishable based on the types of errors that were at issue in those cases. In *Knight*, for example, the defendant was erroneously advised regarding the length of sentence he would receive if he pleaded guilty and was not advised of the consequences of rejecting the government's plea offer. 981 F.3d at 1099. And in *Kearn*, the defendant's counsel failed to advise his client of the significance of a plea agreement under Rule 11(c)(1)(C). 578 F. Supp. 3d at 1235. Thus, in both cases, the defendants were erroneously advised regarding the

---

[8]     While, as noted above, the court finds Ms. Dizon-Maughan's testimony to largely lack credibility based on her purported lack of memory, it notes that Ms. Dizon-Maughan also testified, consistently with other witnesses in the case, that Mr. Jenks never directed her to engage in plea negotiations, wanted to go to trial, and maintained his innocence throughout the case, including after his conviction. (Tr. at 59:1-17.)

sentencing disparity they would face by rejecting the government's plea offers. Under such circumstances, it is understandable that the sentencing disparity was, itself, a key piece of evidence in determining the prejudice caused by the defendant's counsel.

In contrast, the evidence here shows that Mr. Jenks had at least a general understanding of the sentencing disparity he would face if he refused to negotiate with the government. There is no dispute that Mr. Jenks's counsel advised him of the government's invitations to discuss potential plea deals including a 10-year or 8-year sentencing proposal. And Mr. Bautista testified that he informed Mr. Jenks that if he were convicted at trial, his sentence "would be akin to a death sentence as he would die in prison." (Tr. at 69:12-14; 72:9-12; 87:4-11.)

The court finds Mr. Bautista's testimony regarding the advice he gave Mr. Jenks regarding the consequences of being convicted at trial to be credible. Accordingly, the court finds that the evidence shows that Mr. Jenks was advised and understood the sentencing disparity he faced when he rejected the government's inquiries regarding a potential plea deal.

Because Mr. Jenks understood the sentencing disparity he faced, and continued to insist on going to trial, the court cannot find that the sentencing disparity alone substantiates Mr. Jenks's *post hoc* claim that he would have accepted a plea offer had he been properly advised regarding the DNA evidence against him.

Therefore, the court finds that Mr. Jenks has not met his burden of showing, with contemporaneous evidence, that there was a reasonable probability that he would have pleaded guilty if he had received proper advice from his counsel. This failure "provides a sufficient basis, standing alone, to reject [Mr. Jenks's] ineffective-assistance claim." *Watson*, 766 F.3d at 1227.

3.      The court would not have accepted a plea agreement that included an agreed upon sentence of fifteen years or less.

Finally, Mr. Jenks must also show that the court was reasonably likely to have accepted any of the purported plea agreements at issue to satisfy his burden of proving prejudice under *Strickland*.

Mr. Jenks had "no absolute right to have a guilty plea accepted," and the court "may reject a plea in the exercise of sound judicial discretion." *Santobello v. New York*, 404 U.S. 257, 261-62 (1971). "While Rule 11 vests district courts with the discretion to accept or reject plea agreements, the rule does not define the criteria to be applied in doing so." *United States v. Robertson*, 45 F.3d 1423, 1437 (10th Cir. 1995). The Tenth Circuit has recognized, however, that Rule 11 "contemplates the rejection of a negotiated plea when the district court believes that bargain is too lenient, or otherwise not in the public interest." *United States v. Carrigan*, 778 F.2d 1454, 1462 (10th Cir. 1985).

Mr. Jenks offers little to support his contention that there is a reasonable possibility that the court would have accepted any of the pleas he claims were offered in this case, arguing only that the case would have likely been resolved through a plea agreement because most federal criminal cases are. (*See* Pet'r's Post Hr'g Reply at 15-16, ECF No. 49.) But the fact that most federal criminal cases are resolved through plea agreements does not support the conclusion that the particular terms of the plea offers alleged in this case would have been accepted by the court. Mr. Jenks offers no evidence to show there was a reasonable likelihood that the particular terms of the plea offers he alleges were made would have been acceptable to the court.

The government, on the other hand, argues that statements made by the court at Mr. Jenks's sentencing hearing suggest that the court would not accept any of the plea agreements that were

purportedly available to Mr. Jenks. It points to the fact that the court spoke at length about the egregiousness of Mr. Jenks's conduct and indicated that the facts of the case "could support and would support a sentence of lifetime imprisonment." (Gov't's Post Hr'g Br at 26, ECF No. 46.)

It is difficult to predict exactly how the court would have viewed any of the purported plea agreements had they been submitted to the court for approval. That is particularly true in this case, where the details of any plea agreement were never even discussed, let alone agreed to. The court does not have the benefit of considering what justification the government might offer for the deal. Nor does it have the benefit of considering input from the victim in this case. Without such information, it is impossible to know what agreement, if any, the court would be willing to accept to resolve this case before trial.

The court can say with confidence, however, that given the egregiousness of Mr. Jenks's conduct, which included the repeated oral, vaginal, and anal rape by Mr. Jenks of his minor stepdaughter over the course of five years, it would not have accepted any plea agreement that required the court to sentence Mr. Jenks to fifteen years or less in prison. Such a sentence would be far too lenient for the serious crimes committed by Mr. Jenks and would not be in the public interest.

Accordingly, had Mr. Jenks and the government brought any of the purported plea agreements to the court for approval, the court would have rejected them. Mr. Jenks's petition, therefore, fails on the ground that he cannot establish that he was prejudiced by his counsels' purportedly deficient representation.

<u>Conclusion</u>

For the foregoing reasons, Mr. Jenks' Motion to Vacate and Set Aside Convictions and Sentence under 28 U.S.C. § 2255 is DENIED.

Dated this 18th day of September, 2023.


BY THE COURT:

CLARK WADDOUPS
United States District Judge